STEPHEN GIANNAROS,

               Plaintiff,

    v.

THE BEAUFORT BONNET COMPANY, LLC,

               Defendant.

Civil Action No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Stephen Giannaros ("Mr. Giannaros" or "Plaintiff") seeks a permanent injunction requiring a change in The Beaufort Bonnet Company, LLC's ("Beaufort" or "Defendant") corporate policies to cause its online store to become and remain accessible to individuals who are partially sighted, visually impaired, or totally blind. In support thereof, Mr. Giannaros respectfully asserts as follows:

## INTRODUCTION

1.    Plaintiff lives in Peabody, Massachusetts. He works for the Commonwealth as a Senior Vocational Rehabilitation Counselor, helping other Massachusetts residents with disabilities develop individualized plans for employment, among other things. *See* LinkedIn, Steve Giannaros, https://www.linkedin.com/in/steve-giannaros-2967853b/ (last accessed Apr. 14, 2020). Plaintiff is also a former professional musician. *See* SoundCloud, stevegiannaros, https://soundcloud.com /sgiannaros (last accessed Apr. 14, 2020).

2.    Plaintiff was diagnosed with Cone-rod dystrophy ("CRD") when he was twenty. CRD is a genetic eye disorder which causes vision loss as the light-sensing cells of the retina gradually deteriorate. *See Cone-rod dystrophy*, U.S. National Library of Medicine, Genetics Home

Reference (available at https://ghr.nlm.nih.gov/condition/cone-rod-dystrophy) (last accessed Apr. 14, 2020).

3.     Today, Plaintiff has very little usable sight. He cannot see faces or text.

4.     As a result of his visual disability, Giannaros relies on screen reader auxiliary aids, including JAWS 2020 from Freedom Scientific and VoiceOver with iOS, to access digital information, like a Microsoft Word document, an email, or a website.

5.     A screen reader auxiliary aid "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *See also* American Foundation for the Blind, *Screen Readers*, https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed Apr. 14, 2020) (discussing how screen readers work).

6.     Beaufort sells winter apparel and other accessories direct to consumers. Unlike retailers in the past, Beaufort does not operate a brick-and-mortar retail storefront Plaintiff can visit in Peabody, Massachusetts, where he lives. If Mr. Giannaros wants to purchase the goods that Beaufort sells directly, he must do so online.

7.     In order to research and purchase the products that Beaufort sells direct to consumer, customers must visit Beaufort's online store, located at https://www.thebeaufortbonnetcompany.com/ (the "Digital Platform").

8.     Beaufort owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance. *See* Beaufort, Terms and Conditions, https://www.thebeaufortbonnetcompany.com/pages/terms-and-conditions (last accessed Apr. 14, 2020).

9.     Unfortunately, Beaufort denies approximately 8.1 million Americans who have difficulty seeing access to the Digital Platform's goods, content, and services because the Digital Platform is incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports, *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Apr. 14, 2020) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see."); Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping* (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites ("New research by Leanplum found that 95% of consumers will buy at least half of their gifts online.") (last accessed Apr. 14, 2020).

10.    Plaintiff brings this civil rights action against Beaufort to enforce Title III, which requires, among other things, that a public accommodation (1) not deny persons with disabilities

the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

11.     By failing to make its Digital Platform, a service of a public accommodation subject to Title III, available in a manner compatible with screen reader programs, Beaufort deprives individuals who are partially sighted, visually impaired or totally blind the benefits of the goods, content, and services of its online stores—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

12.     Because Beaufort's Digital Platform is not, and has never been, accessible, and because upon information and belief Beaufort does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Digital Platform to become and remain accessible, Mr. Giannaros invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 12(a) | Defendant retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities. | 30-days of Court's Order |
| 12(b) | Defendant work with the Approved Accessibility Consultant to ensure that all employees involved in digital development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages. | 180-days of Court's Order and every 180-days thereafter until the Court orders otherwise |
| 12(c) | Defendant work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis. | 90-days of Court's Order and every 90-days thereafter until the Court orders otherwise |
| 12(d) | Defendant work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business online, in addition to the testing that is performed using semi-automated tools. | 90-days of the Court's Order and every 90-days thereafter until the Court orders otherwise |
| 12(e) | Defendant incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations. | 60-days of receiving recommendations until the Court orders otherwise |
| 12(f) | Defendant work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems. | 60-days of the Court's Order |

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 12(g) | Defendant directly link to the Accessibility Policy from the header of each homepage and the footer on every other page of the Digital Platform. | 60-days of the Court's Order |
| 12(h) | Defendant accompany the Accessibility Policy with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy. | 60-days of the Court's Order |
| 12(i) | Defendant provide a copy of the Accessibility Policy to all digital content personnel, contractors responsible for digital content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform. | 60-days of the Court's Order |
| 12(j) | Defendant train no fewer than three of its CSO Personnel to escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance. | 180-days of Court's Order |
| 12(k) | Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology. | 180-days of Court's Order |

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 12(l) | For a period up to two (2) years after the Approved Accessibility Consultant validates the Digital Platform is free of accessibility errors/violations, Defendant shall provide Plaintiff's Counsel with Quarterly Reports on the progress it is making toward implementing the various provisions of this Agreement, including Defendant's effort to create and implement an Accessibility Policy, testing procedures, the training of its employees involved in website or mobile application accessibility, and information regarding Defendant's continued evaluation of its provision of an accessible online store. Defendant shall also report on and provide a summary of formal grievances it receives regarding the accessibility of its online store, and shall provide a summary of its responses to such grievances to Plaintiff's Counsel. | Until the Court orders otherwise |
| 12(m) | Counsel for Plaintiff and Counsel for Defendant will hold regularly scheduled telephonic meetings within 30 days of the submission of Quarterly Reports in order to discuss ongoing progress towards the implementation of proper accessibility policies and practices. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant. | Until the Court orders otherwise |

13.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website or mobile application will not cause the website or mobile application to remain accessible without a corresponding change in corporate policies related to those web-based technologies. *See* Jonathan Lazur et al., Ensuring Digital Accessibility Through Process and Policy 140 (2015). As one leading commentator notes:

The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that

accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Digital Platform under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2 (Jan. 13, 2016), https://www.browngold.com/wbcntntprd1/wp-content/uploads/BNA-Fighting-for-Accessible-Digital Platformss-Under-ADA.pdf) (last accessed Apr. 14, 2020).

14.     To evaluate whether the Digital Platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause it to remain accessible, the Digital Platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals:

[I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.

Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

## JURISDICTION AND VENUE

15.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

16.     Beaufort attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the Internet to Massachusetts residents, including Mr. Giannaros. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Beaufort purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Massachusetts residents. *Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

17.     Mr. Giannaros was injured when he attempted to access Beaufort's Digital Platform from Peabody, Massachusetts, but encountered barriers that denied him full and equal access to Beaufort's online goods, content, and services.

18.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there." *Otter Products*, 280 F.Supp.3d at 294.

19.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Mr. Giannaros's claims occurred.

## PARTIES

20.     Mr. Giannaros is a natural person over the age of 18. He resides in and is a citizen of Peabody, Massachusetts, located in Essex County.

21.     Mr. Giannaros is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

22.     Defendant The Beaufort Bonnet Company LLC is a Kentucky limited liability company with a principal place of business at 999 Peachtree Street, N.E., Suite 688, Atlanta, GA 30309.

23.     Based on the public information available to Mr. Giannaros, Beaufort has the financial resources to make its online store accessible to screen reader users: Beaufort sells and ships its products throughout the United States, including Massachusetts, and internationally; maintains a robust social media marketing campaign, including into Massachusetts; and has more than 163,000 followers on Facebook, including from Massachusetts.

## FACTS APPLICABLE TO ALL CLAIMS

24.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## HARM TO PLAINTIFF

25.     Mr. Giannaros attempted to access the Digital Platform from Peabody, Massachusetts. Unfortunately, because of Beaufort's failure to build its Digital Platform in a manner that is compatible with screen reader technology, including VoiceOver with iOS, Mr. Giannaros is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Digital Platform.

26.     Plaintiff attempted to access the Digital Platform using VoiceOver with iOS.

27.     "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button (or the side button on iPhone X or later) to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you. …You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next. When



VoiceOver on iPhone

you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range of gestures and assign those you're most comfortable with to the commands you use most." *See* Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last accessed Apr. 14, 2020).

28.     Below is an example of one online store's use of sufficiently descriptive alternative text to describe its products to screen reader users. *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019). The image on the left illustrates what shoppers perceive visually when browsing Custom Ink's online store with an iPhone. To the right, is an image with alternative text highlighted in green. Although invisible to the eye, screen readers read this highlighted text aloud in order to describe the image to shoppers who cannot perceive

content visually. Without this detailed alternative text, screen reader users cannot determine what goods and services are available for purchase; they cannot shop online independently.



29.     Unfortunately, as a result of visiting Beaufort's Digital Platform, and from investigations performed on his behalf, Mr. Giannaros found the Digital Platform to be unusable due to various barriers that deny him full and equal access to the goods and services that Beaufort offers. For example:

a.　The Digital Platform prevents screen reader users from accessing some primary content. For example, when shoppers visit the Digital Platform from a new IP address, Beaufort displays a pop-up window inviting them to "subscribe to sms & receive 15% off!" Shoppers who perceive content visually can type their email and telephone number into the text fields that Beaufort provides in this pop-up window, then click "Let's be friends" to claim the promotion. Unfortunately, the Digital Platform does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of



the Digital Platform's underlying page, making the pop-up invisible to Mr. Giannaros. As a result, it is impossible for Mr. Giannaros to perceive these promotions independently, the effect of which would require him to pay more on his first order than shoppers who do not use screen reader technology to shop online.

b.　Similarly, after shoppers activate or click the menu button on some of the Digital Platform, Beaufort displays a pop-up window on the screen. Shoppers who perceive content visually can click various links in this pop-up to access additional content related to, for example, new arrivals, online exclusives, and outerwear. Unfortunately, because of Beaufort's failure to maintain an accessible online store, the Digital Platform requires that Mr. Giannaros tab through the unrelated elements in the its underlying page before his screen reader eventually tabs to the



primary content of this pop-up window. This burdensome, confusing, and unnecessary interaction frustrates Mr. Giannaros's online shopping experience and makes it more likely that he will leave the Digital Platform without making a purchase.

      c.      The Digital Platform uses visual cues to convey content and other information. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, shoppers who perceive content visually will notice that many products available for purchase on the Digital Platform include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Shoppers who perceive content visually will likely infer that the price appearing in strikethrough font is the "old" or "original" price, while the price



appearing in regular font is the "new" or "sale" price. Unfortunately, screen readers cannot identify the meanings of these two fonts so their users can make an informed decision. Instead, Mr. Giannaros hears two prices for the same product, and cannot determine what they signify, like different quantities, conditions, sizes, or in this case, sales. This confusion prevents Mr. Giannaros from making informed purchasing decisions, and increases the odds he will abandon the purchase process without making a selection at all.

d.      The Digital Platform uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed visually through an audio means is necessary to ensure that screen reader users still perceive this information. For example, Beaufort places a gray "X" atop the sizes in which a particular product is unavailable. Shoppers who perceive content visually will see this visual cue and infer that the product they're researching is unavailable in the corresponding size. Unfortunately, Beaufort fails to include alternative text to also identify which sizes are unavailable, making it impossible for Mr. Giannaros to discover which sizes are out-of-stock while using his screen reader.



e.      Links and buttons on the Digital Platform do not describe their purpose. As a result, blind shoppers cannot determine whether they want to follow a particular link or button, making navigation an exercise of trial and error. For example, shoppers who perceive content visually will recognize the "decrease quantity" and "increase quantity" arrow buttons on the Digital Platform




and understand that by clicking them, Beaufort will decrease and increase the size of their order accordingly. Unfortunately, these buttons are not labeled with sufficiently descriptive alternative text. To this end, the Digital Platform fails to provide any audio instruction when Mr. Giannaros hovers over either button with his screen reader. As a result, Mr. Giannaros cannot independently use this feature, which Beaufort otherwise makes available to shoppers who do not rely on screen reader technology to shop in its online store.

30.     These barriers, and others, deny Mr. Giannaros full and equal access to all of the services the Digital Platform offers, and now deter him from attempting to use the Digital Platform. Still, Mr. Giannaros would like to, and intends to, attempt to access the Digital Platform in the future to research the goods and services the Digital Platform offers or to test the Digital Platform for compliance with the ADA.

31.     If the Digital Platform were accessible, *i.e.* if Beaufort removed the access barriers and implemented the practices described above, Mr. Giannaros could independently research and purchase Beaufort's products and access its other online content and services.

32.     Though Beaufort may have centralized policies regarding the maintenance and operation of its Digital Platform, Beaufort has never had a plan or policy that is reasonably calculated to make its Digital Platform fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

33.     The law requires that Beaufort reasonably accommodate Mr. Giannaros's disability by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

34.     Mr. Giannaros has been, and in the absence of an injunction will continue to be, injured by Beaufort's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS**

35.     Beaufort has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

36.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Apr. 14, 2020); *see also* Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Apr. 14, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

37.     More recently, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and (2) the imposition of liability on businesses for not having an accessible website does not violate the due process rights of public accommodations. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).

### THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

38.     There is no DOJ administrative proceeding that could provide Mr. Giannaros with Title III injunctive relief.

39.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Mr. Giannaros with relief.

40.     Mr. Giannaros alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

41.     Resolution of Mr. Giannaros's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Beaufort offers content and services on its Digital Platform, and (b) whether Mr. Giannaros can access the content and services fully and equally.

### SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

42.     The assertions contained in the previous paragraphs are incorporated by reference.

43.     Beaufort's Digital Platform is a service of a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Access Now, Inc. v. Otter Products, LLC*, 280 F.Supp.3d 293, n.4 (D. Mass. 2017) (J. Saris) ("Several courts have held that a website can be treated as a public accommodation under Title III of the ADA."); *Gathers v. 1-800 Flowers.com, Inc.*, 2018 WL 839381, *1 (D. Mass. Feb. 12, 2018) (J. Talwani) ("Defendant does not dispute that its websites are places of public accommodation subject to regulation by Title III of the ADA."); *National Ass'n of the Deaf v. Netflix, Inc.*, 869 F.Supp.2d 196, 201 (D. Mass. 2012) (J. Ponsor) (holding that company's website was a place of public accommodation); *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) (concluding public accommodations need not have physical structures); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).)

44.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Beaufort does not provide Mr. Giannaros with full and equal access to its Digital Platform, it has violated the ADA.

45.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

46.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

47.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

48.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:  as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

49.     By failing to provide its Digital Platform's content and services in a manner that is compatible with auxiliary aids, Beaufort has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

        (a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Digital Platform;

        (b)     affording individuals with visual disabilities access to its Digital Platform that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

50.     Beaufort has violated Title III by, without limitation, failing to make its Digital Platform's services accessible by screen reader programs, thereby denying individuals who are partially sighted, visually impaired, or totally blind the benefits of the Digital Platform, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

51.     Beaufort has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Digital Platform to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

52.     Making its online goods, content, and services compatible with screen readers does not change the content of the Digital Platform nor result in making the Digital Platform different, but enables individuals with visual disabilities to access the online store Beaufort already provides.

53.     Beaufort's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Mr. Giannaros and other individuals with visual disabilities.

54.     Mr. Giannaros's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

55.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Mr. Giannaros requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure the Digital Platform is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring the Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 12 above.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment. S*ee Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("[Plaintiff], as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor Grove' compliance with the permanent injunction."); *see also* Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Apr. 14, 2020) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case);

(F)    Whatever other relief the Court deems just, equitable and appropriate; and

(G)    An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: April 14, 2020                    Respectfully Submitted,

                                         */s/ Jason M. Leviton*
                                         Jason M. Leviton (BBO# 678331)
                                         **BLOCK & LEVITON LLP**
                                         260 Franklin Street, Suite 1860
                                         Boston, MA 02110
                                         Phone: (617) 398-5600
                                         jason@blockesq.com

                                         *Counsel for Plaintiff*